OPINION OF THE COURT
Freedman, J.
Defendant was convicted of robbery in the first degree (Penal Law § 160.15 [4]) and sentenced to a nine year determinate sentence and five years’ postrelease supervision based on a single witness identification made 15 days after the robbery occurred. Upon exercising our independent factual review power (CPL 470.15), we find that the verdict was against the weight of the evidence (People v Danielson, 9 NY3d 342, 348-349 [2007]). The videotape depicting the robbery does not corroborate the complaining witness’s identification, and, viewed as a whole, the evidence does not establish beyond a reasonable doubt that the identification was accurate.
On November 22, 2006 at approximately 6:00 p.m., the complainant had just closed her store at 256 East Gun Hill Road in the Bronx when two young black men approached her and asked to enter the shop. She reopened the store and showed the men various items. Shortly thereafter, one of the men (not defendant) opened his jacket, displayed a gun and demanded to know where the money was. The other man, purportedly defendant, went behind the counter with the complainant and told her to put the money in a plastic bag. The gun holder ordered the complainant to the back of the store and tied her up with a wire. The complainant testified that she saw defendant’s face at that time. When she tried to break free, the robbers tied her up tighter. She testified that she feared for her life at that point and throughout the robbery. After the robbers left, the complainant called her husband who immediately called the police. The police officers did not take fingerprints because, as they testi *213 fied, the complainant stated that the robbers wore gloves. The wire used to tie the complainant’s hands was tested for DNA, but nothing was found. The complainant described both robbers as being between 18 and 30 years old, five feet seven inches or five feet eight inches and having Jamaican accents, “a little.” She also stated that the unarmed robber had a ponytail under his hat, but definitely not cornrows.
Fifteen days later, on December 7, 2006, the complainant, while a passenger in a car heading west and driven by her husband, passed 374 East Gun Hill Road, where defendant was sweeping the sidewalk in front of his aunt’s store. The complainant, looking across four lanes of traffic, spotted defendant and asserted that he was the second (unarmed) robber. The complainant’s husband pulled closer so that she could see defendant and she positively identified him. The police were called and, after the complainant spoke with them, defendant was arrested. About four hours later, the complainant identified defendant in a lineup; she was not specifically told that defendant would be in the lineup, nor did she see any of the fillers prior to her identification.
At trial, the complainant testified that she was certain that her identification was correct and that she saw defendant’s face when he entered the store. She further testified that throughout the ordeal she feared for her life. Additionally, she testified that although she passed the store where defendant worked every day, she never saw him before or after the robbery until the day he was apprehended. She insisted that the robber had a ponytail, not cornrows.
Defendant denied any involvement in a robbery, testifying that he had worked at his aunt’s store on the day of the robbery, closed it at the usual time, between 6:30 and 7:00 p.m., and had gone home. The videotapes of the robbery were introduced into evidence. Although there are several frontal views of the gun bearing perpetrator (who has not been apprehended), there are no similar views of the second robber, purportedly defendant. All of the views of the second person show him looking down to the side, including the view of the two robbers when they first entered the store. While, according to the police, the complainant reported that the robbers wore gloves, the video shows that they were not wearing gloves and that the second robber was biting his fingernails.
Defendant was 28 years old at the time of the robbery, and about five feet nine inches tall. He had several B misdemeanor *214 convictions for possession of marijuana in a public place, but no other arrests. At the time of his arrest, he wore his hair in cornrows, and both he and his aunt testified that he always wore his hair in cornrows. Defendant, whose parents are from Jamaica, was born in New York City where he was living with his large family in Brooklyn, and had worked in family businesses, earning from $26,000 to $40,000 a year, since finishing high school. He had been working in his aunt’s store on Gun Hill Road, and was working there both at the time of the robbery and 15 days later when he was arrested. He and his aunt testified that he was being paid $300 a week. He also testified that he had never bitten his fingernails and demonstrated that to the jury.
In asserting that his conviction stemmed from a misidentification, defendant points to various discrepancies in testimony, including the complainant’s statement that the robbers wore gloves and the police officers’ reliance on this statement in not looking for fingerprints, although the video plainly shows that this was not the case. The video also shows both robbers looking down when they entered the store, but the complainant testified that she clearly saw defendant’s face when she opened the store. Finally, defendant raised the nail biting inconsistency.
Defendant also avers that, since he had been working steadily in the neighborhood for several months, it is likely that the complainant, who acknowledged passing his aunt’s store regularly, saw him either before or after the incident, and during the two week period that ensued after the robbery, engaged in “transference,” misidentifying him as the perpetrator of the crime. He cites psychology articles on the transference phenomenon as well as the effects of stress on eyewitness memory (i.e., K.A. Deffenbacher, B.H. Bornstein, S.D. Penrod, & E.K. McGorty, A Meta-Analytic Review of the Effects of High Stress on Eyewitness Memory, Law & Hum Behav, vol 28, No. 6 at 687 [2004] [accuracy is negatively affected by high level stress]). However, the prosecutor emphasized that stress increased the complainant’s ability to identify the perpetrator of the robbery. Unfortunately, no expert testimony was offered at trial. Defendant further cites studies showing that the greater the lapse of time, the less accurate an identification is likely to be.
An intermediate appellate court is empowered to examine and review the record as a whole to determine whether the weight of the evidence supports the verdict and whether the People have sustained their burden of proof beyond a reasonable doubt (People v Danielson, 9 NY3d at 348-349; People v Bleakley, 69 *215 NY2d 490 [1987]). “Essentially, the court sits as a thirteenth juror and decides which facts were proven at trial” (Danielson at 348; see People v Chase, 60 AD3d 1077 [2009]). In People v Delamota (18 NY3d 107 [2011]), both the majority and dissent raised concern “about the incidence of wrongful convictions and the prevalence with which they have been discovered in recent years” (id. at 116). The majority stated that the intermediate appellate court is empowered to
“independently assess all of the proof; substitute its own credibility determinations for those made by the jury in an appropriate case; determine whether the verdict was factually correct; and acquit a defendant if the court is not convinced that the jury was justified in finding that guilt was proven beyond a reasonable doubt” (id. at 116-117).
Although, in this case, the trial court gave a comprehensive charge concerning single witness identification, cautioning against inaccuracy and the risk of wrongful conviction and referring to matters such as length of opportunity to view the defendant, lighting conditions, suggestibility, and memory in general, no specific note was made of the 15-day gap or of the possibility of transference. Nor was anything requested or said with respect to “weapon focus” or stress although reference was made to the “mental, physical, and emotional state of the witness before, during and after the observation.”
While no one factor in this case mandates reversal, the combination of factors, namely, the absence of corroborating evidence, apparent lack of a financial motive, the time interval between the event and the identification, the physical discrepancies noted, and the high degree of stress aggravated by the presence of a seemingly lethal weapon, are sufficient to warrant reversal based on the weight of the evidence. For these reasons, we reverse.
Accordingly, the judgment of the Supreme Court, Bronx County (Richard Lee Price, J.), rendered January 15, 2008, convicting defendant, after a jury trial, of robbery in the first degree, and sentencing him to a term of nine years, should be reversed on the facts, the conviction vacated and the indictment dismissed.